Kern v. Kollsman                          CV-93-612-SD   02/09/95 P
                    UNITED STATES DISTRICT COURT FOR THE

                          DISTRICT OF NEW HAMPSHIRE


Gabriel R. Kern


        v.                                        Civil No. 93-612-SD


Kollsman



                              O R D E R


        In this civil action, plaintiff Gabriel R. Kern alleges a

federal claim of age discrimination in violation of the Age

Discrimination in Employment Act of 1967 (ADEA), Pub. L. No. 90-

202, 81 Stat. 602 (codified at 29 U.S.C. § 621, et seq. (1985))

and a common-law breach of employment contract claim against

defendant Kollsman, a division of Sequa Corporation.[1]

        The court's jurisdiction, premised upon the federal question

raised, envelops the supplemental state-law contract issue as

well.  28 U.S.C. §§ 1331, 1367(a).

        Presently before the court is defendant's motion for summary

_____

        [1]Plaintiff's complaint included a third count for loss of
consortium filed on behalf of Pearl Kern, plaintiff's wife.  On
January 20, 1994, defendant filed a Rule 12(b)(6), Fed. R. Civ.
P., motion contending that loss of consortium damages were not
recoverable either under the ADEA or in a breach of contract
action by an individual not a party to the contract.  The court
granted said motion by margin order on March 15, 1994.

judgment, to which plaintiff objects.

## Background

Kollsman is a defense, avionics, and medical equipment manufacturer with its principal place of business located in Merrimack, New Hampshire. Affidavit of Ronald H. Wright ¶ 3 (attached as Exhibit A to Defendant's Motion for Summary Judgment). Plaintiff, having attained a masters degree in electrical engineering, was originally hired by Kollsman on July 18, 1966, to fill the position of Principal Engineer, Electronics. Complaint ¶ 6. In 1977, plaintiff was promoted to Project Engineer, and in 1978 to Program Manager, a position he held until 1990. Id. at ¶ 7. In 1990, plaintiff was transferred from Engineering to Marketing, id. ¶ 8, where he was employed as a Manager of International Marketing, Exempt Employee Performance Appraisal at 1 (Performance Appraisal) (attached as Exhibit 14 to Plaintiff's Objection to Kollsman's Motion for Summary Judgment). On April 8, 1993, Kern, then 60 years of age and earning an annual salary of $79,542, was terminated by Kollsman after nearly 27 years of continuous employment. Complaint ¶¶ 4-5.

"Kollsman's business has traditionally been in the defense area," Wright Affidavit ¶ 3, with the military systems division comprising approximately "70 percent" of all business, Deposition

2

of Charles Bernhardt at 11 (attached as Exhibit 4 to Plaintiff's Objection). Due to a variety of reasons, both global and domestic, "[i]t became clear that defense expenditures around the world would decline and that the defense business would become more difficult." Wright Affidavit ¶ 5.

As an alleged result of such reduced defense expenditures, Kollsman experienced a 50 percent drop in sales between 1990 and 1992, posting a loss of over $23 million in 1991. Id. ¶¶ 6-9. Consistent with such decreasing sales, defendant began to "reduce the number of Kollsman employees in order to save the business and save jobs . . . ." Id. ¶ 8. Between November 1989 and April 1993, when Kern was terminated, Kollsman reduced its work force by approximately 1100 employees on five separate occasions. Affidavit of Richard E. Merkle ¶ 4 (attached as Exhibit B to Defendant's Motion for Summary Judgment).[2] It was understood by Kollsman employees, and Kern in particular, that the reason for such reductions was declining sales in the defense business. Deposition of Gabriel Kern at 47, 50 (attached as Exhibit G to Defendant's Motion for Summary Judgment).

_____

[2]The particular dates and number of employees included in the reductions are as follows: November 1989, 214 employees; May 1991, 356 employees; January 1992, 239 employees; April 1992, 207 employees; April 1993, 7 employees. Merkle Affidavit ¶ 4. No statistical data for the 1989-1992 reductions has been presented to the court.

3

Despite such fiscal belt-tightening, sales and prospective orders "in the military area [for 1993] were way behind budget." Wright Affidavit ¶ 18; Kollsman Inter-Office Correspondence Memorandum from Daniel Guerrette to Richard Delk (attached as Exhibit 5 to Plaintiff's Objection). Determining that further cuts in manufacturing and engineering were no longer feasible, Ronald Wright, President of Kollsman, targeted marketing as the area for further appropriate downsizing. Wright then asked Charles Bernhardt, Vice President of Marketing and Kern's direct supervisor, to prepare a list of individuals recommended for elimination.[3] Wright Affidavit ¶ 19.

Bernhardt returned to Wright with a list of five individuals whose average age was 57.2. Bernhardt Deposition at 73; Merkle Affidavit ¶ 12. Wright agreed with Bernhardt in part, but chose to keep two of the five--Herb Sandberg, then aged 69, and Al Friedrich, then aged 65--since they "both performed important functions for Kollsman." Wright Affidavit ¶ 21. Wright

---

[3]In April 1993 eight individuals directly reported to Bernhardt: Charles Richmond, Vice President of International Marketing; Charles Torrey, Vice President of Marketing, Avionics & Domestic Military Systems; Thomas Henry, Vice President of Avionics; Henry Warren, Director of Marketing, Pacific Region; Steven Russell, Director of Marketing, Market Research & Planning; John Tuttle, Avionics; Al Friedrich, Washington office; and Gabriel Kern. Kern Deposition at 133; Bernhardt Deposition at 27. The average age of these individuals at the time of the work force reduction was 56.75 years, excluding Bernhardt. When Bernhardt is included, the average age increases to 57.33 years.

4

concluded, however, that since he was reducing the size of Kollsman's marketing department, it was now unnecessary to maintain the "Vice President of Marketing" position, and thus "decided to release Mr. Bernhardt." Merkle Affidavit ¶ 14. Since Kern worked as an "assistant" to Bernhardt, Bernhardt Deposition at 43, Wright "also decided that Gabe Kern could also be let go," Merkle Affidavit ¶ 14. The average age of those marketing personnel ultimately included in the April 1993 layoffs was 54.6 years.[4]

## Discussion

### 1. Summary Judgment Standard

Summary judgment shall be ordered when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not [] to weigh the evidence and determine the truth of the

---

[4]This final group consisted of Charles Bernhardt, then aged 62; Gabriel Kern, then aged 60; Thomas Henry, then aged 59; Henry Warren, then aged 51; and Robert Coleman, then aged 41. Wright Affidavit ¶¶ 20-23. Robert Coleman, who worked in Marketing, Training Devices, reported to Charles Torrey, who in turn reported to Bernhardt. Bernhardt Deposition at 27. The average age of the five individuals who previously reported to Bernhardt but remained after the reduction (Richmond, Torrey, Tuttle, Friedrich, and Russell) was 56.8.

5

matter but to determine whether there is a genuine issue for trial.'" Stone & Michaud Ins., Inc. v. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Although "motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal," Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994), the entire record will be scrutinized in the light most favorable to the nonmovant, with all reasonable inferences indulged in that party's favor. Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994); see also Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994); Maldonado-Denis, supra, 23 F.3d at 581.

The respective roles of the movant and the nonmovant in summary judgment practice are precisely choreographed. "The movant must put the ball in play, averring 'an absence of evidence to support the nonmoving party's case.' The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Maldonado-Denis, supra, 23 F.3d at 581 (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citing and quoting, inter alia, Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)

6

(other citations omitted))).

> When a party fails to make a showing
> sufficient to establish the existence of an
> element essential to that party's case, and
> on which that party bears the burden of proof
> at trial, there can no longer be a genuine
> issue as to any material fact: the failure of
> proof as to an essential element necessarily
> renders all other facts immaterial, and the
> moving party is entitled to judgment as a
> matter of law.

Smith, supra, 40 F.3d at 12 (citing Celotex, supra, 477 U.S. at 322-23; Woods, supra, 30 F.3d at 259).

Finally, although "in an employment discrimination case, '"[e]lusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."'" Id. at 13 (quoting Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990))).

2. Evaluating Age Discrimination Claims Under the "Burden Shifting" Paradigm

Where, as here, there is no direct or overt evidence of age discrimination--no "smoking gun"--the Supreme Court has established a burden shifting analysis to facilitate the evaluation of employment discrimination claims. E.g., McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981). Under said framework, the plaintiff must initially make out a prima facie showing of age discrimination. See, e.g., McDonnell Douglas, supra, 411 U.S. at 802; LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1398 (1994); Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 479 (1st Cir. 1993). At this stage of the analysis, however, "[t]he burden of making out a prima facie case is 'not onerous.'" Mesnick v. General Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. 2965 (1992) (quoting Burdine, supra, 450 U.S. at 253).

"The elements of the prescribed prima facie case vary, within the age discrimination context, depending upon whether or not the plaintiff was dismissed as part of a reduction in force." LeBlanc, supra, 6 F.3d at 842. When a work force reduction is the alleged cause of the dismissal, plaintiff's prima facie case is satisfied upon a showing that: (1) plaintiff was at least forty years of age; (2) he met the legitimate job performance expectations; (3) he experienced an adverse employment action; and (4) the employer did not treat age neutrally or that younger employees were retained in the same position. See id. (citing Herbert v. Mohawk Rubber Co., 872 F.2d 1104, 1111 (1st Cir.

8

1989)).

Moreover, "[e]stablishment of the prescribed prima facie case creates a presumption that the employer engaged in impermissible age discrimination." Id. (citing Burdine, supra, 450 U.S. at 254; Goldman, supra, 985 F.2d at 1117. The employer can rebut said presumption by "'articulat[ing] a legitimate nondiscriminatory reason for the employee's termination.'" Id. (quoting Lawrence v. Northrop Corp., 980 F.2d 66, 69 (1st Cir. 1992)) (emphasis in LeBlanc). The employer's burden is thus simply one of production, whereas the burden of persuasion "remains [the employee's] at all times." Mesnick, supra, 950 F.2d at 823.

"[O]nce the employer has proffered a legitimate, nondiscriminatory reason for its adverse employment decision, the presumption generated by the employee's prima facie case disappears . . . ." LeBlanc, supra, 6 F.3d at 842; see also St. Mary's Honor Ctr. v. Hicks, ___ U.S. ___, ___, 113 S. Ct. 2742, 2749 (1993) (once an employer succeeds "in carrying its burden of production, the McDonnell Douglas framework--with its presumptions and burdens--is no longer relevant."). The burden thus "falls back upon the employee to prove that the reason advanced by the employer for the adverse employment action constituted a mere pretext for unlawful age discrimination."

9

LeBlanc, supra, 6 F.3d at 842 (citations omitted).

With regard to pretext, the First Circuit requires plaintiff to put forth both "'minimally sufficient evidence of pretext,'" as well as "evidence that overall reasonably supports a finding of discriminatory animus." Id. at 843 (quoting Goldman, supra, 985 F.2d at 1117). Summary judgment may ensue, therefore, provided "the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer." Id. (citing Goldman, supra, 985 F.2d at 1118). See also Medina-Munoz, supra, 896 F.2d at 9 (to survive a motion for summary judgment, nonmovant must present evidence of "specific facts which would enable a jury to find that the reason given was not only a sham, but a sham intended to cover up the employer's real motive: age discrimination").

3. Kern's Prima Facie Case

As noted previously, plaintiff's burden at this stage is "not onerous," Burdine, supra, 450 U.S. at 253. Plaintiff, being 60 years old at his termination, is clearly a member of the class protected by the ADEA; as of his last employment evaluation, dated March 2, 1993, plaintiff performed his job in a fully competent manner and thus met Kollsman's expectations for a person of like age, training, and position; plaintiff was,

10

however, part of Kollsman's work force reduction, and thus experienced an adverse employment action on April 8, 1993; notwithstanding such termination, plaintiff's duties were assumed by other Kollsman employees with whom he worked who were younger than he yet spared adverse employment action.

## 4. Kollsman's Articulated Reasons for Discharge

Since Kern's prima facie case of age discrimination is not challenged, the court must next address the second prong of the McDonnell Douglas framework--whether Kollsman has articulated a legitimate, nondiscriminatory reason for Kern's dismissal.

Kollsman maintains that the April 1993 layoffs merely represented one episode in a series of work force reductions which the company experienced in the five-year period between 1989 and 1994. Richard E. Merkle, then-Vice President of Human Resources for Kollsman during the April 1993 layoffs, stated in an affidavit that declining sales and financial losses forced Kollsman to reduce its work force in an effort to remain financially viable. Merkle Affidavit ¶ 3.

Kollsman asserts that because it could not afford to make further cuts in manufacturing or engineering, it looked to marketing for the necessary reductions. Wright Affidavit ¶ 19. After discussing the situation with senior marketing personnel

11

and Merkle, Wright identified five positions that could be eliminated. According to Wright, the inclusion of Bernhardt on the final list counseled for Kern's termination as well, since the majority of Kern's responsibilities and duties were comprised of providing support for Bernhardt.[5]

Wright's proffered explanation for Kern's discharge fully satisfies Kollsman's burden at this time. See, e.g., Menard v. First Sec. Servs. Corp., 848 F.2d 281, 285 (1st Cir. 1988) (once plaintiff established prima facie case, "the burden then shifts to the employer to articulate, not prove, a non-discriminatory reason for its action"). "'"[T]hrough the introduction of admissible evidence," [Kollsman has presented] reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" LeBlanc, supra, 6 F.3d at 845 (quoting Hicks, supra, ___ U.S. at ___, 113 S. Ct. at 2747 (quoting Burdine, supra, 450 U.S. at 254-55)). Consequently, the presumption of age discrimination raised by Kern's prima facie case has vanished, and the court must finally determine "whether the evidence, in its entirety, would permit a reasonable fact-

---

[5]Although Wright initially discussed the forthcoming economically driven reductions with both Merkle and Bernhardt, the list of those employees ultimately terminated was compiled-- for obvious reasons--by Wright and Merkle.

12

finder to infer that [Kollsman's] decision to terminate [Kern] was inspired by age animus."  Id.

5.  Kern's Evidence of Age Animus

As proof that Kollsman's decision to terminate him was motivated by intentional age discrimination, Kern alleges, inter alia, that his termination was improperly characterized as a job elimination and that defendant's work force reduction was not based on legitimate business reasons.

In order to survive summary judgment, however, Kern must do more than "simply refute or question the employer's reasons." Gadson v. Concord Hosp., 966 F.2d 32, 34 (1st Cir. 1992) (per curiam).  Rather, he must put forth "'definite, competent evidence' fortifying [his] version of the truth." Vega, supra, 3 F.3d at 479 (quoting Mesnick, supra, 950 F.2d at 822).[6]

_____

[6]The court pauses at this point to note that much of plaintiff's argument is based upon the deposition testimony of Charles Bernhardt.  Contrary to plaintiff's numerous references to "statements made by the defendant's own employees," Plaintiff's Objection at 16, and invocation of Rule 801(d)(2), Fed. R. Evid., Bernhardt's deposition answers are not accorded the status of "admission by party-opponent."  As subsection (d)(2)(D) makes clear, such statements are deemed admissions only if made "by the party's agent or servant concerning a matter within the scope of the agency or employment [and] made during the existence of the relationship."  Rule 802 (d)(2)(D), Fed. R. Evid. (emphasis added); see also Oki Am., Inc. v. Microtech Int'l, Inc., 872 F.2d 312, 314 (9th Cir. 1989) (discussing reach of Rule 802(d)(2)).  Bernhardt's deposition testimony, taken after his April 1993 termination, may provide relevant evidence,

13

> "Merely casting doubt on the employer's articulated reason does not suffice to meet the plaintiff's burden of demonstrating discriminatory intent, for '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons' in the first place. To hold otherwise would impose on the defendant an almost impossible burden of proving 'absence of discriminatory motive.'"

Dea v. Look, 810 F.2d 12, 15 (1st Cir. 1987) (quoting White v. Vathally, 732 F.2d 1037, 1043 (1st. Cir.), cert. denied, 469 U.S. 933 (1984) (quoting Burdine, supra, 450 U.S. at 253-54)).

Kern claims that he was not dismissed pursuant to a reduction in force because many of his previous responsibilities were not eliminated with his position, but rather were allocated to younger employees. Such a redistribution of responsibilities, Kern argues, proves that his position was not "eliminated" and thus Kollsman's purported work force reduction is merely a pretext for age discrimination. In the alternative, Kern argues that his position was subject to a job combination rather than a job elimination and, as such, a peer ranking should have been performed.[7] The failure of Kollsman to conduct such a ranking,

_____

but it does not rise to the "admission by party-opponent" level.

[7]When economic and business conditions necessitated a reduction in force, Kollsman identified three job action categories in order to facilitate the lay-off process--job elimination, job reduction, and job combination. Deposition of Richard Merkle at 15 (attached as Exhibit 6 to Plaintiff's

14

according to Kern, is further evidence of discriminatory animus.

### a.  Discriminatory Pretext

Kern initially proffers the following deposition testimony of Bernhardt to establish pretext:

> Q.  In terms of the thinking that went into deciding who to put on the layoff list, was their impact on the payroll a consideration?
> A.  Yeah.
> . . . .
> Q.  . . . A person's cost to the company was figured by reference not only to his salary, but by reference to other things, as well; would you agree?
> A.  That's correct.
> Q.  Okay.  And some of those other things would be his employee benefits?
> A.  Yes.
> Q.  Secretary?
> A.  Yes.
> Q.  Expense accounts?
> A.  Yes.

---

Objection).  According to the "Reduction in Force Procedures" memorandum, a job elimination

> is the cleanest of the three job actions. In its simplest application, it too can be purely objective.  If the decision is made that a <u>job</u> is no longer necessary and thus eliminated, it is not necessary to make <u>people</u> decisions if it is also decided that incumbents will be terminated with the job.

Memorandum from Richard Delk to Rolph Pagel at 3 (attached as Exhibit J to Defendant's Motion for Summary Judgment). Alternatively, a job combination "occur[s] where two or more jobs are combined to form one single job requiring skills in the two or more individual jobs."  <u>Id.</u> at 4.

15

> Q. Going back to the employee benefits, how close they'd be to retirement, that is when the pension would have to be paid?
> A. I would assume that's a consideration, because under the new laws, you have to reserve for that type of thing. And I think that is a factor, and it could be a very large factor.
> Q. And in terms of the pensions, Kollsman had a so-called defined benefit --
> A. Yes.
> Q. -- type of plan; is that correct?
> A. Yes, that's correct.
> Q. And the longer a person served at Kollsman, the higher his pension benefits would be once he retired?
> A. That's correct.

Bernhardt Deposition at 84-86. However, the mere reference to a correlation between pension and age, standing alone, is insufficient to sustain plaintiff's burden of demonstrating pretext. As the Supreme Court recently illustrated:

> When the employer's decision _is_ wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes [about older workers] disappears. This is true even if the motivating factor is correlated with age, as pension status typically is. . . . Our holding [therefore] is simply that an employer does not violate the ADEA just by interfering with an older employee's pension benefits . . . .

Hazen Paper Co. v. Biggins, ___ U.S. ___, ___, 113 S. Ct. 1701, 1706-08 (1993).


b. Job Elimination

Kollsman does not dispute that Kern's responsibilities have

16

been redistributed.  In response to interrogatories propounded by plaintiff, defendant indicates that the majority of plaintiff's duties were allocated as follows:

> Charles Torrey and Charles Richmond have assumed responsibility for tasks which Mr. Kern previously performed for them.
> Steve Russell and Marion Dube now assist in responding to bids and proposals and assist in preparing Master Authorizations.
> Louis Liuzzo and Steve Russell apply for temporary export licenses.
> Cheryl Poulin and Jeanette Motzko help prepare some of the reports previously done by Mr. Kern.
> Many marketing employees help with customer demonstrations and respond to customer inquiries.
> Charles Punte reviews teaming agreements.

Plaintiff's First Set of Interrogatories and Requests for Production of Documents at 3 (attached as Exhibit 7 to Plaintiff's Objection).

The truism that "'[a]n employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge,'" LeBlanc, supra, 6 F.3d at 846 (quoting Barnes v. GenCorp, Inc., 896 F.2d 1457, 1465 (6th Cir.), cert. denied, 498 U.S. 878 (1990)), is inapplicable due to the following rationale. "A discharged employee 'is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.'"  Id. (quoting

17

Barnes, supra, 896 F.2d at 1465). Replacement occurs "only when another employee is hired or reassigned to perform the plaintiff's duties." Barnes, supra, 896 F.2d at 1465. As the above-quoted interrogatory response makes plain, Kern was not replaced, as contemplated by the cited cases, but rather his position was eliminated.

### c. Job Combination

Kern next argues that further evidence of the pretextual nature of Kollsman's explanation for his termination lies in the following excerpt from Richard Merkle's deposition:

> Q. Did you make any effort with reference to Mr. Kern to familiarize yourself with all responsibilities he performed?
> A. No.
> Q. And as far as you're concerned, you didn't have to?
> A. Correct. The emphasis being in "all."
> Q. How familiar were you . . . with what Mr. Kern did?
> A. Somewhat, but not really in great detail. He did not work for me.

Merkle Deposition at 34-35.[8]

According to Richard Merkle, Kollsman was directed by its

---

[8]The evidence as to who at Kollsman made the ultimate decision to terminate Kern is unclear, but for purposes of the instant motion all inferences, as required, will be drawn in plaintiff's favor. As illustrated infra, such a determination is irrelevant to the ultimate issue of whether plaintiff's age was a substantial motivating factor in the termination calculus.

corporate parent to reduce its general and administrative expenses--which encompassed marketing, financial, and human resources--by one million dollars. Merkle Deposition at 17-18. In order to meet this quota, Bernhardt testified that he "was, essentially, told how many people [he] had to eliminate and in what categories, generally." Bernhardt Deposition at 86. Merkle and Wright, after initial consultation with Bernhardt, decided that it would be necessary to eliminate five positions from the marketing department.

The court's role in this proceeding is not "to second-guess the business decisions of an employer." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990). Whether it would have been more prudent for Merkle to completely familiarize himself with the precise details of Kern's job description is immaterial to the issue before the court--and insufficient to sustain plaintiff's burden at this stage.

> Plaintiff continues to carry the burden of showing discriminatory intent, and the relevant question is whether the given reason was a pretext for discrimination:
>> It is not enough for the plaintiff to show that the employer made an unwise business decision, or an unnecessary personnel move. Nor is it enough to show that the employer acted arbitrarily or with ill will. These facts, even if demonstrated, do not necessarily show that age was a motivating factor.

Dea v. Look, supra, 810 F.2d at 15 (quoting Gray v. New England

19

<u>Tel. & Tel. Co.</u>, 792 F.2d 251, 255 (1st Cir. 1986) (emphasis in <u>Gray</u>)). The court finds the evidence as it relates to job elimination or combination to be completely devoid of any suggestion that defendant's asserted reasons for the discharge are masking an underlying discriminatory animus.[9]

### d. Declining Sales Figures

Kern also disputes Kollsman's claim that it was experiencing financial difficulties during 1993 and, more specifically, that such fiscal distress necessitated a reduction in Kollsman's work force.

According to Kern, "[i]t is unlikely that the defendant's financial problems could be solved by a reduction of [only seven employees]." Plaintiff's Objection at 43. However, it is immaterial as a matter of law that the April 1993 work force reduction resulted only in the release of seven[10] Kollsman

---

[9]On the contrary, defendant has put forth substantial evidence that Kern's position with the company was salvaged numerous times from the previous rounds of layoffs. In particular, at the time when Kollsman was making cuts in engineering, Kern's department between 1966 and 1990, Wright authorized his transfer to marketing--an option unavailable to Kollsman's younger engineers. Wright Affidavit ¶ 14.

[10]Two security guard positions were also eliminated in the April 1993 reductions. Although these individuals were also members of the class protected by the ADEA, 52 and 62 years old, respectively, the evidence indicates that Kollsman's entire security staff is between 52 and 73 years old. Guerrette

employees.[11]  "An employer need not dismiss any particular number of employees, or terminate a set percentage of the work force, to institute a reduction in force.  Rather, '[a] work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company.'" LeBlanc, supra, 6 F.3d at 845 (quoting Barnes, supra, 896 F.2d at 1465) (emphasis added in LeBlanc).

Kern further asserts "[t]he uncontested facts are that the defendant had an operating profit of 3.5 million dollars in 1992

_____

Affidavit ¶ 5 (attached as Exhibit E to Defendant's Motion).

[11]Of more potential relevance is the fact that all seven employees--the five marketing personnel and both security guards--are in the class protected by the ADEA.  Upon reviewing the evidence before it, the court notes the following: (1) Prior to the April 1993 termination, twenty-two people were employed at Kollsman's marketing department in Merrimack, New Hampshire; (2) of said twenty-two, only four were not in the class protected by the ADEA; and (3) the April 1993 terminations caused the average age of the marketing department to decrease approximately 1½ years from 49.45 years old to 47.94 years old.  Plaintiff's First Set of Interrogatories at 14.  Whatever probative effect this evidence may have, the court further notes that "statistical evidence . . ., in and of  itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee." LeBlanc, supra, 6 F.3d at 848 (citation omitted).  Thus, "'[w]ithout an indication of a connection between the statistics,' the practices of the employer, and the employee's case, statistics alone are likely to be inadequate to show that the employer's decision to discharge the employee was impermissibly based on age." Id. (citing and quoting Gadson, supra, 966 F.2d at 35).

21

and 4.0 million dollars in 1993." Plaintiff's Objection at 43.[12] The court has reviewed the Operational Report and notes that the actual profit figures belie plaintiff's characterization. In pressing his case, plaintiff chooses to rely on profit figures which do not take interest charges or taxes into account.[13] Kollsman's financial outlook is less optimistic when the pre-tax/post-interest figures are employed. Despite showing a pre-tax profit of approximately $1.1 million for 1993 overall, the first two quarters of 1993--the time frame during which Kollsman was considering the work force reduction--actually resulted in sizable losses.

When considering financial data in an age discrimination case, the First Circuit has held that

_____

[12]Plaintiff draws these figures from the "Kollsman Operational Report for 1992 and 1993" (Operational Report), attached as Exhibit 13 to Plaintiff's Objection. Defendant produced said document pursuant to a motion to compel, with the condition that the document be placed under seal. The court unsealed said document on January 30, 1995, in order to address the particulars of the current motion for summary judgment.

[13]To assert that pre-interest and pre-tax profit figures accurately represent a business's financial position is to deny the very profound impact such numbers have on a corporation's "bottom line." In more general terms, a variety of costs and factors must be accounted for when establishing a corporation's profitability. Because interest charges must be paid regardless of whether the corporation is showing a profit, such amounts cannot be ignored when evaluating the balance sheet. In order to accurately assess the financial condition of Kollsman, therefore, the court will utilize the pre-tax, but post-interest, figures of the Operational Report.

> [t]he question for a jury would not be
> whether [the employer's] finances, viewed by
> one yardstick, might arguably be seen by
> someone else in a more optimistic light than
> did its managers, but whether there was
> evidence of profitable performance sufficient
> to permit a reasonable jury to infer that
> [the employer's] proffered pessimistic
> analysis--given as a reason for the layoffs--
> was a mere pretense.

LeBlanc, supra, 6 F.3d at 847. On the basis of the evidence before it, the court "find[s] no triable issue over [Kollsman's] assertion that unprofitability concerns fueled its decision to lay off [Kern] and the others." Id.

The First Circuit has admonished that "'[c]ourts may not sit as super personnel departments, assessing the merits--or even the rationality--of employers' nondiscriminatory business decisions.'" Id. at 847 (quoting Mesnick, supra, 950 F.2d at 825). After considering the "aggregate package of proof offered by the plaintiff," Mesnick, supra, 950 F.2d at 824, the court finds inescapable the ultimate conclusion "that a reasonable factfinder could not infer pretext or age discrimination from these circumstances," LeBlanc, supra, 6 F.3d at 845. In consequence thereof, defendant's motion for summary judgment on plaintiff's ADEA claim must be and herewith is granted.

23

## 6. Breach of Contract

### a. Discretion to Adjudicate

Having granted defendant's motion for summary judgment on the ADEA claim, the court is thereupon entitled, at its discretion, to either retain supplemental jurisdiction and continue to adjudicate the state-law claim or decline same, leaving the plaintiff to seek relief in state court. See 28 U.S.C. § 1367(c) (1993). Such discretion is "considerable" and should be evaluated "in light of such considerations as judicial economy, convenience, fairness to litigants, and comity." Newman v. Burgin, 930 F.2d 955, 963 (1st Cir. 1991) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). Although "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims," Carnegie-Mellon, supra, 484 U.S. at 350 n.7, "the doctrine of [supplemental] jurisdiction . . . is a doctrine of flexibility, designed to allow courts to deal with cases involving [supplemental] claims in the manner that most sensibly accommodates a range of concerns and values," id. at 350.

Plaintiff's contract claim raises neither novel nor complex issues of state law. In point of fact, the New Hampshire Supreme

Court has recently addressed the issues raised in plaintiff's complaint on two distinct occasions. See Butler v. Walker Power, Inc., 137 N.H. 432, 629 A.2d 91 (1993); Panto v. Moore Business Forms, Inc., 130 N.H. 730, 547 A.2d 260 (1988). Furthermore, a dismissal of the state-law claim at this stage of the proceedings would only serve to waste precious judicial resources and needlessly prolong the resolution of the instant controversy.

Upon consideration of the competing concerns and values, the court, in its discretion, finds and rules that a dismissal is not warranted and thus will proceed to resolve the entire matter in this unitary proceeding.

### b. The Merits

Plaintiff contends that on several occasions defendants promulgated literature which either expressly or impliedly served to modify his status as an at-will employee. More specifically, Kern asserts that, based on alleged oral and written representations from Kollsman, he developed "an expectation of continued employment unless the application of [peer ranking] procedures and [other] objective criteria indicated that my termination was warranted." Affidavit of Gabriel Kern ¶ 14 (attached as Exhibit 2 to Plaintiff's Objection).

Defendant's employment handbook contains the following

25

disclaimer:

> EMPLOYMENT-AT-WILL STATEMENT
> It is understood that nothing contained in
> the employment application, in the granting
> of an interview, or in this handbook is
> intended to create an employment contract
> between Kollsman and the individual either
> for employment or for providing any benefit.
> It is understood that no employment guarantee
> is binding upon Kollsman unless the terms and
> conditions are specified in writing.  If an
> employment relationship is established, it is
> understood that the employee has the right to
> terminate his/her employment at any time and
> that Kollsman retains a similar right.

Kollsman Handbook for New Hampshire Employees at iv (attached as Exhibit L to Defendant's Motion).  Defendant asserts that the clear meaning of said disclaimer is that it "did not alter the at-will relationship of the parties.  It created no employment contract."  Defendant's Motion at 17.

In Panto, supra, the New Hampshire Supreme Court held that the at-will status of an employment relationship is "one of prima facie construction," not "substantive law."  Panto, supra, 130 N.H. at 739-40, 547 A.2d at 267.  Although the Panto court did not have the issue of durational modification of the at-will employment relationship properly before it, the court noted that an employer "could simply . . . avoid[] the entire issue [of contractual liability] by announcing in the written policy itself that [the policy] was not an offer, or a policy enforceable as a contractual obligation."  Id., 130 N.H. at 742, 547 A.2d at 268.

26

The Panto dictum was adopted and affirmed in Butler, wherein the court limned "[b]y virtue of the disclaimer, . . . the bare employment contract remains with a presumptive at-will status." Butler, supra, 137 N.H. at 437, 629 A.2d at 94. The court finds and rules, therefore, that the "Employment-At-Will Statement" contained in Kollsman's employee handbook sufficiently disclaims any durational modification to the contract between Kollsman and its at-will employees. The "right to arbitrary termination, absent [a] violation of public policy, [therefore] remains in the hands of the employer." Id.

This conclusion, however, does not end the matter. Kern further submits that certain documents promulgated by Kollsman regarding reduction in force procedures lack any disclaiming language, can be found to be contractual promise equivalents, and are thus valid and enforceable modifications to his at-will status. See, e.g., Kollsman Division Policy and Procedure Reduction in Force (Policy and Procedure) (attached as Exhibit 3A to Plaintiff's Objection); Employee Peer Ranking Assessment Forms (Peer Assessment Form) (attached as Exhibit 3B to Plaintiff's Objection).

Plaintiff's argument on this issue, in sum, proceeds as follows:

> Under the circumstances of this case, a
> jury could find that the defendant's

27

> promulgation of the document entitled, "Division Policy and Procedure Reduction in Force" and dated 12/16/91, modified the terms of the parties' employment relationship and agreements, that the plaintiff relied thereon in continuing his employment with the defendant, that the defendant failed to abide by this policy when it terminated the plaintiff in April of 1993, and that the plaintiff was damaged thereby.

Plaintiff's Objection at 50. For the reasons that follow, the court disagrees.

As an initial matter, plaintiff's contention that "defendant made enforceable express and implied promises that decisions regarding lay offs would be based on objective criteria and not on age-related considerations," id., is unavailing due to the failure of proof regarding age discussed supra, part 5. Plaintiff's "failure to follow reduction policy" argument is likewise prejudiced.

Prior to his termination, plaintiff was employed as a "salaried exempt employee." See Performance Appraisal at 1. Where a reduction in force affects salaried exempt employees, "employees in affected departments will be peer ranked by job classification." Policy and Procedure at 2 (emphasis added). However, "[a] Peer Ranking assessment form need not be completed on an employee who is in a one-of-a-kind position that is being eliminated." Peer Assessment Form at 1.

The interplay between these two policy positions is

28

illuminated in the following excerpt from Merkle's deposition:

> Q. Where in those established procedures is
> there a category that pertains to Mr. Kern:
> A. Uhm, reduction in force is required.
> "Employees in affected departments will be
> peer ranked by job classification."
> Q. That's the --
> A. it was obvious that Mr. Kern was in a
> one-of-a-kind job.
> Q. Is it your testimony that that's the
> provision that pertains to Mr. Kern?
> A. It's quite obvious there were no peers.
> Q. My question is: Is that the provision
> that pertains to Mr. Kern?
> A. Yes.
> Q. Okay.
>         (Discussion off the record.)
> Q. With reference to the other employees who
> were subject to a layoff simultaneous with
> Mr. Kern, were they subjected to any peer
> ranking?
> . . . .
> A. Mr. Bernhardt was not; Mr. Henry was not;
> Mr. -- Mr. -- Warren was.
> Q. Is that Warren Henry?
> A. That's -- his name is Hank Warren.
> Q. Oh, okay.
> A. Mr. Coleman was.

Merkle Deposition at 59-60. The unique character of Kern's position at Kollsman is further underscored by the testimony of Bernhardt:

> Q. Was there anyone else in the company who
> had a job like Mr. Kern's?
> A. No.
> Q. Was it pretty much a one-of-a-kind-type
> job?
> A. I would say -- was it a one-of-a-kind-
> type job? Well, since I had all the
> marketing, I would have to say it was one of
> a kind for a guy in that position, yeah. It
> was things that had to be picked up. If they

29

> fell on the floor, you would not be able to
> --
> Q. Was there anyone else who sort of had an
> equivalent job to Gabe Kern's?
> A. No.

Bernhardt Deposition at 81. The evidence thus unequivocally demonstrates that plaintiff's position at Kollsman, whether he was cognizant of it or not, was "one-of-a-kind." Plaintiff's assertion that "defendant failed to abide by [its termination] policy" simply rings untrue.

However, even assuming arguendo that defendant neglected to precisely follow its termination procedures, plaintiff's breach of implied contract claim is further stymied by the "bright line" drawn by the <u>Panto</u> court between "the durational status of an employee and the incidents of employment[14]. . . ." <u>Butler</u>, <u>supra</u>, 137 N.H. at 436, 629 A.2d at 93 (citing <u>Panto</u>, <u>supra</u>, 130 N.H. at 739, 547 A.2d at 267).

Although the <u>Butler</u> court indicated that a "plaintiff well might make a case asserting damages from failure to follow the step discipline procedure as a contractual incident of

---

[14]In <u>Panto</u>, such "incidents of employment" were post-layoff salary and fringe benefits. <u>Panto</u>, <u>supra</u>, 130 N.H. at 739, 547 A.2d at 267. The "incident of employment" in <u>Butler</u> was a three-step discipline process prior to termination. <u>Butler</u>, <u>supra</u>, 137 N.H. at 436, 629 A.2d at 93. The putative "incident of employment" in the case at bar is a peer ranking prior to work force reduction. Such an "incident of employment" is more akin to that found in <u>Butler</u> rather than <u>Panto</u>. Plaintiff's reliance on <u>Panto</u> for support therefore is misplaced.

30

employment, unrelated to any durational claim . . . [t]he ultimate act of termination would be a thin reed for such a case . . . ." Id., 137 N.H. at 437, 629 A.2d at 94. Since "[d]amages must arise from failure to follow the procedure short of termination" and the court failed to identify any "damages independent of damages flowing from the loss of continued employment with the employer," the directed verdict for the defendant was proper. Id.

Plaintiff's case similarly rests on too frail or thin a reed. The court therefore finds and rules that plaintiff's breach of express or implied contract claim based on materials promulgated by his employer is insufficient as a matter of law. In consequence thereof, defendant's motion for summary judgment with respect to said breach of contract claim must be and herewith is granted.

## Conclusion

For the reasons set forth herein, defendant's motion for summary judgment (document 15) is hereby granted in its entirety. The clerk of court is thus instructed to enter judgment for the

31

defendant as to all counts.

     SO ORDERED.


                                                _____
Shane Devine, Senior Judge
United States District Court

February 9, 1995

cc:  Francis G. Murphy, Jr., Esq.
     James W. Donchess, Esq.